UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

Case # 17-CR-28-FPG-JJM

DECISION AND ORDER

VALENTINO SHINE, SR.,

Defendant.

## INTRODUCTION

On September 25, 2019, a jury found Defendant Valentino Shine, Sr., guilty of narcotics conspiracy (Count 1), using and maintaining a drug-involved premises (Count 2), possession of cocaine base with intent to distribute (Count 3), sex trafficking (Counts 4-8), and conspiracy to commit sex trafficking (Count 9).[1] On October 9, 2019, Defendant moved to set aside the verdict under Federal Rules of Criminal Procedure 29 and 33. ECF No. 387. Defendant's motion is DENIED.

## LEGAL STANDARD

Rule 29(c) permits a defendant to move for a judgment of acquittal within 14 days after a guilty verdict. "A Rule 29 motion should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotation marks omitted). "The standard on a motion for a judgment of acquittal is stringent, and a defendant claiming that he was convicted based on insufficient evidence bears a very heavy burden." *United States v. Guobadia*, No. 16-CR-6036, 2019 WL 4593525, at *1 (W.D.N.Y. Sept. 23, 2019) (internal quotation marks omitted). The Court must view the evidence and all reasonable inferences therefrom in the light

---

[1] The Court refers to the charges as they are set forth in the redacted superseding indictment. *See* ECF No. 384.

1

most favorable to the government. *See id.* "The test is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt." *Id.*

Under Rule 33, a court may vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Duncan*, No. 18-CR-289, 2019 WL 5824205, at *5 (S.D.N.Y. Nov. 7, 2019). "The district court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." *Id.* (internal quotation marks omitted).

## DISCUSSION

Defendant challenges Counts 1, 3, and 4 through 9. The Court analyzes each conviction in turn.

### Count 1 – Narcotics Conspiracy

On Count 1, Defendant asserts (1) that the Court provided a misleading supplemental instruction in response to a jury note; and (2) that there was insufficient evidence establishing the quantity of cocaine base involved in the conspiracy.

Count 1 alleges that Defendant engaged in a conspiracy to possess with intent to distribute, and to distribute, 28 grams or more of a mixture and substance containing cocaine base. ECF No. 384 at 1. The conspiracy was alleged to have begun "on a date unknown . . . but no later than in or about September 2016, and continuing until in or about December 2016." *Id.*

During deliberations, the jury sent a note asking for clarification on Count 1. The note read:

> We need to clarify the ability to consider the amount of drugs, possession, sold in 4 mth period. What are we allowed to consider as evidence tword [sic] the 28 grams.

ECF No. 383-9 at 1. With the parties, the Court reviewed the note and stated that the jury seemed to incorrectly believe the narcotics conspiracy was limited to a four-month period—September 2016 to December 2016—as opposed to a longer period beginning on "a date unknown" but "no later than" September 2016. To clarify that issue, the Court reread Count 1 of the indictment, and the jury resumed their deliberations.

Defendant claims that the Court's reading of the indictment was misleading because it caused the jury to believe that the indictment was evidence. That is, because the jury asked what evidence it could consider, and the Court responded by reading the indictment, the "message conveyed to the jury" was that the indictment was evidence. ECF No. 387 at 5. He asks for a new trial on this basis.

"A response to a jury's note is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *United States v. Riley*, 90 F. Supp. 3d 176, 190 (S.D.N.Y. 2015) (internal quotation marks omitted). In reviewing a supplemental instruction, the court must evaluate it "in the context of the instructions as a whole." *United States v. Velez*, 652 F.2d 258, 261 (2d Cir. 1981).

The Court is not persuaded that its supplemental instruction was misleading. The Court understood the jury to be asking what evidence could be considered to determine drug quantity during the four-month period set forth in the indictment; by rereading Count 1 of the indictment, the Court clarified that the conspiracy was not so temporally circumscribed. While the Court's supplemental instruction may not have fully answered the jury's question, it would be entirely unreasonable for the jury to have interpreted the Court's instruction in the manner Defendant

proposes. Moreover, the Court instructed the jury not to treat the indictment as evidence. Because a jury "is presumed to act logically" and to "follow the instructions of the trial judge," the Court is not convinced that the jury would have been misled in the respect Defendant claims.[2] *United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987).

Defendant's second argument on Count 1 is that there was insufficient evidence for the jury to find that the conspiracy involved at least 28 grams of cocaine base. He emphasizes the fact that only one collection of cocaine base was seized and weighed—and that amount came to approximately 13 grams. *See* Gov't Ex. 74. The leaves approximately 15 grams that are not accounted for by "concrete testing or evaluation." ECF No. 387 at 4.

"The drug quantity attributable to a defendant knowingly participating in a drug distribution conspiracy includes (1) transactions in which he participated directly, (2) transactions in which he did not personally participate, but where he knew of the transactions or they were reasonably foreseeable to him, and (3) quantities he agreed to distribute or possess with intent to distribute regardless of whether he ultimately committed the substantive act." *United States v. Pauling*, 924 F.3d 649, 657 (2d Cir. 2019) (internal quotation marks omitted). "To prove the quantity by one of these means beyond a reasonable doubt, the government must introduce specific evidence of drug quantities, or evidence from which quantity can, through inference, be logically approximated or extrapolated." *Id.*

---

[2] Even if the instruction were erroneous, because Defendant did not object to the supplemental instruction on that ground, the instruction would be reviewed for plain error. *See United States v. Van Putten*, 282 F. App'x 950, 952 (2d Cir. 2008) (summary order). Defendant has failed to demonstrate that this alleged error is so egregious as to call into question "the integrity of his conviction." *United States v. Dede*, 321 F. App'x 35, 37 (2d Cir. 2009) (summary order).

To the extent Defendant asserts that only drugs scientifically analyzed may be considered, he is incorrect. Lay testimony and circumstantial evidence can be sufficient, "without the introduction of an expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction." *United States v. Bryce*, 208 F.3d 346, 353 (2d Cir. 1999); *see, e.g.*, *United States v. Crisp*, 563 F.2d 1242, 1244 (5th Cir. 1977) (evidence sufficient to prove identity of drug as cocaine, where defendants referred to white powder as "coke," snorted it, weighed it, and sold it for "substantial sums of money").

Like drug identity, drug quantity may be proved through circumstantial evidence. *United States v. Adames*, 727 F. App'x 12 (2d Cir. 2018) (summary order), is illustrative. There, the Second Circuit concluded that the government presented sufficient evidence of drug quantity. The issue was whether the defendant was part of a narcotics conspiracy involving five kilograms of cocaine. The conspiracy involved the mailing of drugs from Puerto Rico to New York. *Adames*, 727 F. App'x at 13. Four such packages totaling 3.936 kilograms of cocaine were seized and presented at trial, which the Second Circuit found was "direct proof" of drug quantity. *Id.* at 14. The court also concluded that a reasonable jury could "infer the existence of an additional 1.06 kilograms from the aggregate of the additional unseized packages" that were linked to the defendant but not weighed. *Id.* Specifically, "[t]he jury could reasonably have considered that if each of the five unseized packages contained a comparable weight as the average of the seized packages, the total would far exceed five kilograms." *Id.* This is because the "[t]he seized packages were sufficiently representative of the unseized packages to support the inference that the unseized packages contained enough cocaine to reach the quantity threshold." *Pauling*, 924 F.3d at 658-59. In short, while drug quantity may not be adduced through speculation or inferential leaps, the government may meet its burden through specific, circumstantial evidence of quantity.

5

*See id.* at 657-60. "So, if a witness testifies that he bought a gram of crack each week for a year, the jury can do the basic math and conclude that the defendant sold about 50 grams." *United States v. Walker*, 750 F. App'x 324, 326 (5th Cir. 2018) (summary order).

In this case, the government met its burden of proving the nature and quantity of the drugs that Defendant sold through a mix of direct and circumstantial proof. There is scientific proof—in the form of chemical testing—that Defendant possessed 13.2 grams of cocaine base in December 2016. *See* Gov't Ex. 74. That is the amount that was seized pursuant to a search warrant of Defendant's home.

From this representative sample, one could reasonably infer that Defendant distributed at least another 15 grams of cocaine base. By way of background, officers seized from Defendant's home 30 small plastic baggies that contained cocaine base. *See* Gov't Exs. 46H, 46O. Several victims testified that it was Defendant's practice to package cocaine base in such small baggies and then sell them to customers for $50 each. *See, e.g.*, ECF No. 390 at 54-55; ECF No. 391 at 17-18; ECF No. 392 at 53; ECF No. 393 at 58; ECF No. 394 at 38-39. Because each baggie was the same size and was sold for a consistent price, the jury could reasonably infer that each baggie contained a roughly similar amount of cocaine base. *See Pauling*, 924 F.3d at 658 (seized package of cocaine was representative of unseized package, for purposes of determining drug amount, where both packages were of similar weight). Using simple math from the seized baggies, one can thus infer that each $50 baggie that Defendant sold weighed approximately .44 grams.[3]

Based on this, there was sufficient evidence to conclude that Defendant distributed at least another 15 grams of cocaine base. One victim testified that on one particular night Defendant

---

[3] During laboratory testing, 18 baggies were found to weigh 7.87 grams, which would be .437 grams per baggie. All 30 baggies weighed 13.2 grams, which would be .44 grams per baggie. The consistency between these weights supports the inference that each baggie weighed approximately .44 grams.

made $1000 from selling drugs. ECF No. 391 at 63. Another victim stated that she once sold a baggie of cocaine base on Defendant's behalf, ECF No. 389 at 19-20, and was given two baggies on another occasion, ECF No. 390 at 43. These few occasions alone would amount to 10.12 grams of cocaine base.[4]

In addition, one victim testified that Defendant sold those small baggies of crack cocaine to customers "every time [she] was with him." No. 394 at 39. He would give regular customers drugs "throughout the month" on credit. *Id.* at 40-41. Another witness testified that she saw Defendant sell crack on a daily basis during the few months she lived with him. ECF No. 391 at 95. Another victim stated that from the time she started working for Defendant in April 2015, he had a "run" that he would do "every night" to "sell his crack" to people, which included stops at multiple houses. ECF No. 390 at 44-45. Given their own addictions, drug use, and firsthand accounts, these victims could reasonably testify that the substance Defendant was distributing was, in fact, cocaine base. *See Bryce*, 208 F.3d at 353-54 (identity of substance may be established by "the physical appearance of the substance[,] . . . testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence"). And even if Defendant only sold one baggie per day, it would take less than two weeks for Defendant to sell 5 grams of cocaine base.

To be sure, this analysis requires some amount of extrapolation and approximation. But drug quantities may be determined "through extrapolation, approximation, or deduction," so long as there is evidence of "known quantities[] which are sufficiently representative of the unknown quantities and from which an approximation of the unknown quantities can logically be derived."

---

[4] $1000 would be 20 baggies at $50 per baggie, which would amount to approximately 8.8 grams of cocaine base. Three baggies would be approximately 1.32 grams.

*Pauling*, 924 F.3d at 657. The approximations in this case are "logically based" on other facts "known to exist." *Id.* at 656. There is firsthand testimony that Defendant packaged cocaine base for sale in a particular type of package and sold it for a set amount. There is evidence establishing the approximate weight of the cocaine base in each package. And there is evidence of how often Defendant sold those packages to customers. These facts provide the necessary scaffolding for a reasonable jury to conclude that Defendant's narcotics conspiracy involved at least 28 grams of cocaine base. Neither acquittal nor a new trial is warranted.

Accordingly, Defendant's motion is denied as to Count 1.

<u>Count 3 – Possession of Cocaine Base with Intent to Distribute</u>

Defendant argues that acquittal is required on Count 3 because there was insufficient evidence that he intended to distribute the cocaine base seized from his residence. *See* ECF No. 387 at 5-6. The Court disagrees. There was abundant evidence that during this time, Defendant had an operation in which he sourced cocaine, ECF No. 392 at 55-57, cooked the cocaine into cocaine base, ECF No. 391 at 17, packaged the cocaine base, *id.* at 18, and then sold and gave cocaine base to others, ECF No. 392 at 55. A reasonable jury could infer from these activities that Defendant possessed the seized drugs with an intent to distribute them. *See United States v. Barnes*, 140 F.3d 737, 739 (8th Cir. 1998) (concluding there was sufficient evidence of intent to distribute a small amount of methamphetamine where "the evidence shows that [the defendant] led a large-scale conspiracy to manufacture and distribute methamphetamine"); *United States v. Lecroy*, 402 F. App'x 440, 443 (11th Cir. 2010) (summary order) ("Evidence of [a defendant's] other drug dealing [is] relevant to the issue of whether [he] intended to distribute the drugs he possessed at the time of his arrest."). Defendant's motion is denied on Count 3.

## Counts 4-8 – Sex Trafficking

Defendant contends that acquittal or a new trial is required on the sex-trafficking counts because there was insufficient evidence that the victims were coerced into engaging in commercial sex acts. Before delving into the relevant evidence, the Court sets forth the law on coercion.

On these four counts, Defendant was charged with violating 18 U.S.C. § 1591. *See* ECF No. 384 at 2-5. That section provides:

> Whoever knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act . . . shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a)(1). Coercion is defined to include "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." *Id.* § 1591(e)(2)(A)-(C). Serious harm is broadly defined to mean "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm." *Id.* § 1591(e)(5).

It is worth emphasizing that "[b]road, expansive language is employed" in Section 1591. *Noble v. Weinstein*, 335 F. Supp. 3d 504, 516 (S.D.N.Y. 2018). Coercion is not limited to overt uses of violence, like torture, but encompasses more subtle forms of manipulation and exploitation of a victim's vulnerabilities. *See United States v. Bell*, 761 F.3d 900, 913 (8th Cir. 2014) ("Victim vulnerability is relevant to whether a victim was coerced."); *see also* Stephen C. Parker & Jonathan

T. Skrmetti, *Pimps Down: A Prosecutorial Perspective on Domestic Sex Trafficking*, 43 U. Mem. L. Rev. 1013, 1037 (2013) (discussing legislative history). To that end, courts have held that a fear of severe withdrawal symptoms can constitute a "serious harm." *See United States v. Fields*, 625 F. App'x 949, 952 (11th Cir. 2015) (summary order); *United States v. Mack*, 808 F.3d 1074, 1081-82 (6th Cir. 2015).

In *Fields*, the defendant coerced victims to engage in commercial sex acts by "withholding pills from them and thereby causing them to experience withdrawal sickness if they did not engage in prostitution." *Fields*, 625 F. App'x at 952. "The withdrawal sickness was so severe that it caused the victims to want to die. [He also] isolated the victims to preclude them from obtaining drugs elsewhere and to render them dependent on him and subservient to his demands." *Id.* The Eleventh Circuit held that this was sufficient for a reasonable jury to find that the defendant had caused the victims to "engage in commercial sex acts by means of force, threats of force, fraud, or coercion." *Id.*

In *Mack*, the Sixth Circuit came to a similar conclusion. There, the defendant "coerced the victims into prostituting themselves by initially supplying them with drugs under the pretense that they were free." *Mack*, 808 F.3d at 1081. "When he suddenly cut them off and demanded payment, he exploited their addiction, which his previous supply of free drugs had cultivated. For instance, [one victim] testified that defendant would withhold heroin until she went to prostitution sessions, thus using her addiction as an incentive to prostitute herself." *Id.* "The evidence also showed that the victims engaged in commercial sex acts in order to avoid the physical and psychological harm of heroin and cocaine withdrawal." *Id.* at 1082. One victim "testified that when she did not prostitute herself, she would get sick from lack of heroin. Without it, she would sweat, vomit, shake, and kick her legs uncontrollably." *Id.* The Sixth Circuit noted that "[t]he fact

10

that several of the victims had pre-existing drug addictions [did] not make [the defendant's] actions any less coercive." *Id.* He "used those addictions to his advantage by supplying 'free' drugs to the victims, which not only resulted in a high (and fictitious) drug debt, but also exacerbated their addictions." *Id.* "At that point, defendant carefully controlled [the victims'] access to drugs to cause them to engage in acts of prostitution, which they did to avoid the painful withdrawal symptoms induced by defendant's intermittent and unpredictable supply of free drugs." *Id.*

The evidence in this case shows that Defendant's victims were likewise uniquely vulnerable due to their drug addictions. As Dr. David Dietz, the government's expert in the neurobiology of drug dependence and addiction, explained, drug addiction "is a powerful, powerful thing." ECF No. 397 at 23. Through the high they induce and the withdrawal symptoms they relieve, drugs like heroin and cocaine base provide strong reinforcement at the psychological and neurobiological level to encourage an addict to continue ingesting the drug. *Id.* at 14. Longer drug use makes withdrawal more severe and amplifies the reinforcing effect of further drug use. *Id.* at 12. For cocaine base, withdrawal tends to be more psychological, resulting in anxiety, depression, sadness—the opposite of the sensation the drug produces. *Id.* at 11-12. Heroin causes physical symptoms wherein "everything is painful." *Id.* at 17. Dr. Dietz's descriptions of drug withdrawal are echoed in the victims' testimony. *See, e.g.*, ECF No. 390 at 155 (stating that withdrawal from cocaine base is mental and causes one to chase the first high); ECF No. 391 at 93-94; ECF No. 392 at 22-23 (describing heroin withdrawal as like being "on the verge of death").

While Defendant may not be responsible for causing the victims' addictions in the first place, he may be held responsible to the extent he exploited those addictions to coerce victims into commercial sex acts. *See Mack*, 808 F.3d at 1082. Indeed, looking at the evidence in the light most favorable to the government, Defendant's coercive behavior often went far beyond that.

11

Victim 1 had known Defendant for many years before the events underlying this case. She was addicted to cocaine base for a number of years, and in Spring 2015, she relapsed. ECF No. 389 at 3. Victim 1 testified it was "almost impossible to stop" ingesting cocaine base once she started. *Id.* at 7. Cocaine base gave her a "numbing" sensation that allowed her to avoid the feelings of disgust, humiliation, and low self-esteem that she felt while doing drugs and engaging in prostitution. *See id.*; ECF No. 390 at 24, 44. Withdrawal induced physical symptoms like "cravings," "stomach churning," "horrendous" mood swings, headaches, and body pain. ECF No. 390 at 42. After she relapsed, Defendant recruited her into his prostitution operation. He set the prices, made the rules, and retained all of the proceeds. ECF No. 389 at 16-17, 35, 44.

Initially, Defendant provided Victim 1 with affection and gave her ample access to drugs. *Id.* at 34; ECF No. 390 at 43. But he created an environment intended to induce dependence and to ensure that Victim 1 continued to prostitute for his benefit. He beat, intimidated, humiliated, and yelled at Victim 1 on numerous occasions when she kept proceeds for herself, failed to follow his rules, or refused to work. *See, e.g.*, ECF No. 390 at 17, 19-20, 30, 33, 98. Defendant would also refuse to provide Victim 1 with drugs in order to control her behavior. *Id.* at 41-43. In one instance, when Victim 1 refused to work, Defendant hit her "so hard in [the] eye that [she] peed [her] pants." *Id.* at 30. Although Victim 1 intermittently fled from Defendant, she returned because she had "nowhere else to go." *Id.* at 141.

Because Defendant kept the money for himself, controlled access to drugs, and gave Victim 1 a place to stay, she was dependent on him to stave off withdrawal and homelessness. *See* ECF No. 389 at 34 ("I didn't want to go on the streets, didn't want to end up homeless again. I was scared to death."). This was not unique to Victim 1; in trafficking these women, Defendant used drugs and shelter as a means of coercion. Victim 1 testified that Defendant told women "if they

didn't prostitute themselves they would get no drugs and they would have to leave," despite the fact that "a lot of them had nowhere else to go." ECF No. 390 at 128. On one occasion, when one woman failed to get enough money and violated Defendant's rules, he beat her, forced her to leave the house, and dropped her off in the middle of the city. ECF No. 389 at 21.

Victim 2 relayed a similar story. Victim 2 was a heroin addict who became homeless in Summer 2015. ECF No. 390 at 156. She found shelter in a crack house near Grant Street in Buffalo. *Id.* at 157. Defendant met Victim 2 there because he supplied the denizens of that crack house with drugs. *Id.* at 158. Promising that she could "live better in a better place" and make "a lot more money," Defendant enticed Victim 2 to prostitute herself in his operation. *Id.* at 159. Victim 2 initially declined the offer, but she soon found herself living in "very dangerous" circumstances. ECF No. 391 at 6. She called Defendant, who provided her with drugs and a place to stay. *Id.* at 7-8. At the time she was beginning to feel the effects of heroin withdrawal. *See* ECF No. 390 at 152 (describing effects of withdrawal).

Victim 2 began engaging in prostitution for Defendant. Defendant exercised significant control over her: she could not close any door to the home, including the bathroom door, ECF No. 391 at 10, 19, she could not look at or talk to anyone without his permission, *id.* at 21, she had to work every night from 10 PM to 8 AM, *id.* at 19, and Defendant chose which calls she would take, *id.* at 60. Victim 2 testified that she felt compelled to do so because Defendant scared her. ECF No. 391 at 15-16. Although he did not hit her, he would intimidate her. *Id.* at 26 ("[H]e would get really in my face like on my level looking straight at me in the eyes with [a] really scary face."). She was "extremely" fearful of Defendant. *Id.* at 26-27. In exchange for her work, she received drugs, but Defendant controlled her supply. *Id.* at 16, 27. After two months with Defendant, Victim 2 ran away in the night. *Id.* at 28. In response, Defendant sent threatening texts to her. *Id.*

13

at 29. Victim 2 testified that she stayed with Defendant for those two months because she "had a roof over my head and [] wasn't sleeping in gas station bathrooms or Tim Horton's bathrooms and I was using." ECF No. 391 at 30.

Victim 3 was a longtime user of cocaine base and heroin. She described heroin withdrawal as being on "the verge of death," involving puking, diarrhea, and cold sweats. ECF 392 at 23. In July 2015, she purchased cocaine base from Defendant and he offered to let her stay at his home if she prostituted for him. *Id.* at 28. Defendant told Victim 3 that she could not "be getting high" if she stayed there, however. *Id.* At that point in time, she was living on the streets, which she found "pretty tough." *Id.* Victim 3 agreed to work for Defendant, hoping that it would allow her to get clean and "get some money together." *Id.* at 31.

Despite Defendant's apparent rule against drug use, he provided Victim 3 with cocaine base and Suboxone. *Id.* at 32. She stayed with Defendant for about four months. *Id.* at 38. Defendant set the prices and rules, *id.* at 34-35, 37, and retained the proceeds, *id.* at 37. Defendant would give Victim 3 drugs once she returned from a call. *Id.* at 39. On a couple of occasions, when Victim 3 was suffering from withdrawal and did not want to prostitute herself, Defendant "would just like kind of dangle [drugs] in front of my face and he would give it to me like in little pieces so I can go out and make money." *Id.* at 40-41. Defendant also used physical force against Victim 3 on a few occasions, pushing her and, once, choking her. *Id.* at 47-48. Victim 3 overhead Defendant threaten another prostitute with violence. *Id.* at 58. At trial, she opined that she was scared of Defendant because he was a "scary looking guy." *Id.* at 44. Victim 3 testified that she would not have worked for Defendant absent her drug addiction. *Id.* at 63-64.

When she met Defendant in Winter 2015, Victim 4 was living on the streets of Buffalo. ECF No. 394 at 4-5. She was addicted to crack and heroin. *Id.* at 5. When she did not have either,

14

she felt "desperate" and "awful." *Id.* at 6. She was already engaging in prostitution because, as she testified, she was "desperate for drugs." *Id.* at 9. When Defendant met Victim 4, he took her to a motel and gave her drugs. *Id.* at 8. Later, Victim 4 agreed to prostitute for Defendant's benefit. He received all the proceeds, and she received drugs, clothing, and a "place to stay." *Id.* at 11-12. Defendant set the prices and the rules. *Id.* at 13, 27-28. Defendant would control Victim 4's supply of drugs; she received more based on the money she brought in. *Id.* at 27, 37. Defendant would yell at her if she broke any rules. *Id.* at 28.

Victim 4 described her relationship with Defendant as one of manipulation, and she testified that she followed Defendant's rules and orders because she was scared. *Id.* at 56. She had been "kicked out of [her] house" and had "nowhere else to turn to," and Defendant gave her shelter, clothing, and "unlimited drugs." *Id.* at 56-57. Victim 4 said Defendant took advantage of her. *Id.*

Victim 5 passed away before trial. The jury heard evidence through other victims regarding her circumstances. The evidence shows that Victim 5 was a heroin and crack addict and worked for Defendant at times during the relevant period. *See, e.g.*, Gov't Ex. 167; ECF No. 390 at 94. One day in April 2015, Victim 1 witnessed Defendant beat Victim 5 after she violated some of Defendant's rules and overdosed. *See* ECF No. 389 at 21.

What emerges from these individual stories—when viewed in the light most favorable to the government—is a picture of Defendant's overall pattern, plan, and practice. Defendant targeted and recruited women from areas in Buffalo notorious for their prostitution activity, like Grant Street. *See, e.g.*, ECF No. 393 at 33. These were women in dire straits, who lived on the streets in dangerous, dirty conditions, and who went to great lengths to finance their drug habits and thereby stave off the physical and mental suffering caused by their addictions. A reasonable

15

jury could find that the pain and suffering these women faced while homeless and drug addicted constituted a "serious harm" within the meaning of Section 1591(e)(5).

While Defendant cannot be blamed for the situation in which his victims found themselves, that did not give him a license to exploit those harms in order to coerce his victims into performing commercial sex acts on his behalf. Defendant enticed the victims into his operation with promises of money, shelter, clothing, and, most importantly, access to drugs. However, the threat that Defendant could withhold these things if the women did not follow his rules or make enough money was ever-present. That threat was all the more salient because Defendant retained the proceeds from prostitution activity, which rendered the victims dependent on him and effectively prevented them from seeking drugs or other necessities elsewhere. Furthermore, Defendant cultivated an atmosphere of violence—both through actual violent acts and more subtle intimidation—that caused the victims to fear him.

Defendant paints these relationships as voluntary, noncoercive exchanges where the victims were free to enter and leave the arrangement at will. But a reasonable jury could find Defendant's conduct more nefarious because he actively exploited victims' fear of homelessness, withdrawal, and violence to compel them to engage in commercial sex acts when they otherwise would not have done so. He controlled their drug supply (going as far as to dangle drugs in front of one dope-sick victim so that she would prostitute herself), threatened, implicitly and explicitly, to put them back on the street (going as far as to violently throw one victim out of his house and drop her off on a cold night in the middle of the city), and cultivated an air of intimidation (going as far as to, after she refused to engage in prostitution one day, hit a victim so hard that she involuntarily urinated). Defendant's intent is summed up in his self-created nickname, "BABIPAE": "Break a Bitch Incorporated Pimping Ain't Easy." ECF No. 393 at 154.

In short, a reasonable jury could find that Defendant coerced the victims, in that he employed a "scheme, plan, or pattern" intended to cause them to believe that if they failed to engage in commercial sex acts, they would incur a "serious harm" within the meaning of the statute. 18 U.S.C. § 1591(e)(2)(B). As a result, a reasonable jury could find that Defendant knowingly recruited, enticed, and maintained these victims, knowing or in reckless disregard of the fact that force, threats of force, fraud, or coercion would be used to cause them to engage in a commercial sex act. *Id.* § 1591(a)(1). The contrary inferences and evidentiary gaps that Defendant cites in his motion do not undermine this conclusion; at most, they presented factual conflicts that were the jury's responsibility to resolve. The Court is not in a position to reweigh the evidence. *See United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) (stating that on a Rule 29 motion, a court "should not substitute its own determination of the credibility of witnesses, the weight of the evidence and the reasonable inferences to be drawn for that of the jury").

Accordingly, the Court is not persuaded that Defendant is entitled to acquittal or a new trial on Counts 4 through 8.

### Count 9 - Conspiracy to Commit Sex Trafficking

Defendant argues that acquittal is proper on Count 9 because there was insufficient evidence that "two or more people . . . agree[d] to coerce" the victims. ECF No. 387 at 12. As the Court discussed above, there was sufficient evidence that Defendant intended to, and did in fact, coerce the victims. There was also evidence that Defendant conspired with his longtime girlfriend to traffic women. *See, e.g.*, ECF No. 390 at 18-19; ECF No. 391 at 12-14; ECF No. 392 at 30, 32-33; *see also* 18 U.S.C. § 1594(c). Therefore, Defendant's motion is denied on Count 9.

## CONCLUSION

For the reasons discussed above, Defendant's motion to set aside the verdict (ECF No. 387) is DENIED.

IT IS SO ORDERED.

Dated: December 16, 2019
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court